IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MYRA FURCRON, | : | CIVIL ACTION NO. |
| | : | 1:14-CV-1188-RWS-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **ORDER AND FINAL REPORT AND** |
| MAIL CENTERS PLUS, LLC, | : | **RECOMMENDATION ON A** |
| | : | **MOTION FOR SUMMARY** |
| Defendant. | : | **JUDGMENT** |

Plaintiff Myra Furcron filed the Complaint in this action in the Superior Court of DeKalb County on March 7, 2014, and on April 22, 2014, Defendant Mail Centers Plus, LLC, removed the action to this Court. Plaintiff alleges that she was employed by Mail Centers Plus, LLC, from 2008 until December 6, 2012, when her employment was terminated. She claims that Defendant subjected her to unlawful sexual harassment, and unlawfully retaliated against her, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*

The action is before the Court on the Defendant's Motion for Summary Judgment [53] and Defendant's Motion to Exclude Declarations Filed in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment [74] ("Motion to Exclude"). For the reasons discussed below, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [53] be **GRANTED**, and that

judgment be entered in favor of Defendant on all of Plaintiff's claims. Defendant's

Motion to Exclude [74] is **GRANTED IN PART, DENIED IN PART**.

## I.     FACTS

Unless otherwise indicated, the Court draws the following facts from Defendant's "Statement of Material Facts as to Which Defendant Contends No Genuine Issue Exists to Be Tried" [53-2] ("Def. SMF"), and "Plaintiff's Statement of Additional Material Facts to Which There Is a Genuine Issue to Be Tried" [69-9] ("Pl. SMF"). The Court also draws some facts from "Plaintiff's Response to Defendant's Statement of Material Facts to Which there Is No Genuine Issue to Be Tried" [69-10] ("Pl. Resp. SMF"), and "Defendant's Response to Plaintiff's Statement of Additional Material Facts to Which There Is a Genuine Issue to Be Tried" [75-14] ("Def. Resp. SMF").

For those facts submitted by the Defendant that are supported by citations to record evidence, and for which the Plaintiff has not provided any response or otherwise specifically disputed and refuted with citations to record evidence showing a genuine dispute of fact, the Court deems those facts admitted, pursuant to Local Rule 56.1B. *See* LR 56.1(B)(2)(a)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or

paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1).").

The Court has excluded assertions of fact by either party that are wholly immaterial or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to evidence in the record or asserted only in the party's brief and not the separately numbered statement of facts. *See* LR 56.1(B)(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). The Court has also viewed all evidence and factual inferences in the light most favorable to the non-movant, as required on a motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

The Court notes that both parties have objected to many of the opposing party's proffered facts on the ground that an asserted fact is not relevant or material to the claims and defenses presented in this case. The Court nevertheless includes some of those facts because they provide background information that is helpful to explain the

context of the parties' asserted facts and contentions. The parties also attempt to dispute many of the opposing party's proffered facts, but the majority of these disputes are over minor and immaterial issues. Indeed, as explained below, the resolution of this motion ultimately turns on a relatively few number of truly disputed facts. Accordingly, the Court will not rule on each and every objection or dispute presented by the parties, and will discuss those objections and disputes in the analysis section only when necessary to do so regarding a genuine dispute of a material issue of fact. Thus, unless stated otherwise, the Court assumes the facts as stated by Plaintiff.

### Defendant's Statement of Facts

Plaintiff Myra Furcron began her employment with Defendant Mail Centers Plus, LLC ("Defendant," "MCP" or the "Company") in or around June of 2008. Def. SMF at ¶ 5; Pl. SMF at ¶ 1; Pl. Dep. [57] at 53; Comp. [1-1] at ¶ 10. MCP is a business services provider specializing in a broad range of facilities and administrative support activities for mid-sized and large organizations. Def. SMF at ¶ 1; Def. Ex. A [53-3], 30(b)(6) Dep. of Ronald E. Davie, Oct. 8, 2014 ("Davie Dep.") at 27.[1]

---

[1] The 30(b)(6) deposition of Ronald Davie [64] appears to be the only deposition of Davie in the record, although Davie also testified about factual matters of which he has personal knowledge. *See* Davie Dep. [64] at 6, 189-96.

On or about June 6, 2008, Plaintiff received a copy of the MCP Associate Handbook, which contained the Company's policies against sexual harassment. Def. SMF at ¶ 6; Pl. Resp. SMF at ¶ 7; Pl. Dep. at 78; Davie Dep. at 50. Plaintiff signed and acknowledged that she was responsible for reading and complying with all the policies contained in the handbook and any subsequent revisions. Def. SMF at ¶ 7; Pl. Resp. SMF at ¶ 7; Pl. Dep., Ex. 5; Davie Dep. at 51. The 2006 Associate Handbook states "Prohibited harassment includes . . . Written or graphic material that denigrates . . . an individual . . . because of sex." Def. SMF at ¶ 8; Pl. Dep., Ex. 1, at 6. The 2011 Handbook prohibits "[t]he display of sexually suggestive pictures . . . in any workplace location." Def. SMF at ¶ 9; Pl. Dep., Ex. 6, at MCP00010.

Some of the events surrounding the facts of this case took place at The Coca-Cola Company ("TCCC"), one of MCP's largest client sites in Atlanta. Def. SMF at ¶ 2; Pl. SMF at ¶ 71; Davie Dep. at 27. During the relevant time period, Plaintiff and Daniel Seligman worked in Coke Receiving (the "KOR"). Def. SMF at ¶ 3; Pl. SMF at ¶¶ 3, 9, 15; Def. Ex. B [53-4], Maloney Dep. at 27. Employees in the KOR are responsible for receiving, processing, and sorting all inbound mail and small packages throughout the work site. Def. SMF at ¶ 4; Def. Ex. C [53-5], Wright Dep. at 10. Plaintiff started as a mail clerk at TCCC in 2008, but began working as a distribution clerk in the KOR in 2010. Def. SMF at ¶ 10; Pl. Dep. at 56; Comp. at

¶ 11. On an unspecified date, Plaintiff was transferred to the KOR dock. Def. SMF at ¶ 11; Davie Dep. at 50; Maloney Dep. at 27; Wright Dep. at 102. Plaintiff regularly worked the scanning station in the KOR. Def. SMF at ¶ 12; Pl. Dep. at 65; Davie Dep. at 132-33; Wright Dep. at 55; Maloney Dep. at 31.

Danny Seligman, the co-worker that Plaintiff alleges harassed her, was hired on March 28, 2011, as a distribution clerk in the mailroom. Def. SMF at ¶ 17; Davie Dep. at 277-78; Def. Ex. H [53-10], Seligman Dep. at 8, 11. Seligman was transferred to the KOR dock area with Plaintiff on November 27, 2012.[2] Def. SMF at ¶ 18; Davie Dep. at 117; Seligman Dep. at 16. Seligman received training from several employees, including Plaintiff at the scanning station. Def. SMF at ¶ 19; Pl. Dep. at 75; Maloney Dep. at 76. Defendant contends that Seligman did not interact with Plaintiff on a continuous basis, as he was receiving training from other employees in different areas in the KOR. Def. SMF at ¶ 20; Seligman Dep. at 17; Maloney Dep. at 76; Def. Ex. E [53-7], Davis Dep. at 48. Plaintiff, on the other hand, contends that they interacted "on a continuous basis." Pl. Resp. SMF at ¶ 20; Pl. Dep. at 200.

---

[2] Plaintiff states that she "denies" that Seligman's transfer happened on November 27, 2012, but she has cited to no evidence in the record disputing Seligman's testimony that he started working at the KOR on November 27, 2012. *See* Pl. Resp. SMF at ¶¶ 18, 44. Accordingly, because Plaintiff failed to controvert this fact with citations to record evidence, this fact is deemed admitted. *See* LR 56.1(B)(2)(a)(2), NDGa

Seligman has Asperger's Syndrome, but it is generally known to MCP employees in the KOR and others who work for TCCC that Seligman has "autism." Def. SMF at ¶ 21; Pl. SMF at ¶ 8; Pl. Dep. at 132; Davie Dep. at 122-23. Seligman often exhibits mannerisms that are deemed awkward and inappropriate, including staring, standing in people's personal space, brushing up against employees, and talking in people's faces. Def. SMF at ¶ 22; Davie Dep. at 123-24; Davis Dep. at 34-35; Maloney Dep. at 88; Def. Ex. F [53-8], Fortson Dep. at 13-17 According to Defendant, both male and female employees in KOR experienced Seligman's staring, standing too close, or brushing up against them. Def. SMF at ¶ 23; Davie Dep. at 123-24; Maloney Dep. at 88; Davis Dep. at 34-35; Fortson Dep. at 13-17.

On one occasion, a male employee walked in on Seligman removing his clothes in the workplace men's bathroom. Def. SMF at ¶ 25; Davie Dep. at 125; Seligman Dep. at 39. Seligman had an accidental bowel movement and he removed his clothes to clean himself up. Def. SMF at ¶ 26; Seligman Dep. at 39; Davie Dep. at 125. On another occasion, Seligman and another employee were walking together through TCCC discussing movies when Seligman, keeping with the movie conversation, made a comment about what would happen if someone robbed the credit union. Def. SMF at ¶ 27; Seligman Dep. at 32; Davie Dep. at 125. The employee reported it, but noted the context and his belief that Seligman was not being serious. Def. SMF at ¶ 28;

Davie Dep. at 125, 140. The employee reported that he thought Seligman was joking around with him.[3] Def. SMF at ¶ 29; Davie Dep. at 140.

On another occasion, a TCCC employee was walking in the lobby and noticed Seligman near the security station "acting awkwardly and strange." Def. SMF at ¶ 30; Davie Dep. at 137-38. Seligman had headphones on and the employee thought he said the word "kill." Def. SMF at ¶ 31; Davie Dep. at 138. She reported the issue to the TCCC security office, and TCCC located Seligman's department and reported the issue to Vandrena Armstrong, Mail Room Supervisor. Def. SMF at ¶ 32; Davie Dep. at 138. Ronald Davie, Director of Human Resources, contacted TCCC and informed them of Seligman's disability. Def. SMF at ¶ 33; Davie Dep. at 138. The information was presented to the individual, who was another Human Resources employee, and

---

[3] Plaintiff objects to these contentions on the ground that the statements by the unidentified employee to Davie are "inadmissible hearsay." Pl. Resp. SMF at ¶¶ 27-29. The Court overrules this objection because the employee's statements are not offered for the truth of the matter asserted, but only to explain the witness's understanding of the incident and his actions in response. What Seligman actually said to the employee is immaterial. Moreover, Plaintiff cites to Davie's testimony regarding this incident in her own Statement of Facts, when she alleges that "Seligman told another employee that they should rob the credit union." Pl. SMF at ¶ 14. Plaintiff cannot object on hearsay grounds when MCP cites to Davie's testimony, and then turn around and cite to the same testimony in support of her own contentions. Unless otherwise noted, the Court overrules the hearsay objections by both parties regarding what other employees said about Seligman, because the statements are not offered for the truth of the matter asserted.

she noted that it explained his mannerisms at the time. Def. SMF at ¶ 34; Davie Dep. at 139.

Seligman had formed a friendship with another TCCC employee, Julia Schival. Def. SMF at ¶ 36; Seligman Dep. at 12; Davie Dep. at 108-09. Schival, along with some of the other TCCC employees, would frequently schedule lunch with Seligman, and Seligman would often visit their offices to chat. Def. SMF at ¶ 37; Seligman Dep. at 12; Davie Dep. at 108-09; Maloney Dep. at 52; Def. Ex I [53-11], Armstrong Dep. at 14. Schival asked Seligman on one occasion to assist her by taking items to her car, and Seligman would frequently wait on her to help her take items up to her office in the morning. Def. SMF at ¶ 38; Davie Dep. at 109. According to Defendant, Schival did not have a problem with Seligman, but she became concerned that others, like her boss, would think she was unable to do her job because Seligman stayed in the area too long to chat and did not know when to leave. Def. SMF at ¶ 39; Davie Dep. at 110; Maloney Dep. at 52-54.

Defendant contends that Schival thought that others might deem Seligman's actions inappropriate not knowing his disability, so she contacted one of the supervisors. Def. SMF at ¶ 40; Davie Dep. at 110; Maloney Dep. at 52-54. In a conversation with Davie, Schival acknowledged that she did not have any issues with Seligman, but felt that, given his disability, he might continue to do the same thing

when he delivered mail to the floor.[4] Def. SMF at ¶ 41; Davie Dep. at 112-13. Davie decided that a transfer might be appropriate, to limit Seligman's "down-time." Def. SMF at ¶ 42; Davie Dep. at 113. Defendant contends that Seligman was transferred to the KOR, and started working there on November 27, 2012. Def. SMF at ¶ 44; Seligman Dep. at 16; Davie Dep. at 117.

According to Defendant, on an unspecified date, Plaintiff told Chaune Davis, the Distribution Services Support Clerk, that Seligman stood too close to her and that he had an erect penis. Def. SMF at ¶ 45; Davis Dep. at 28. Plaintiff also spoke with her direct supervisor, Roger Maloney, about Seligman having an erection when he left the bathroom and she told Maloney that she was going to get proof. Def. SMF at ¶ 46; Maloney Dep. at 90-92, 99. Plaintiff testified that she told Maloney that Seligman was "walking into me and deliberately looking dead in my face, that's what I told Roger, and I said this is not an accident." Def. SMF at ¶ 47; Pl. Dep. at 112-13.

---

[4] Plaintiff also objects to these contentions on the ground that the statements by Schival to Davie are "inadmissible hearsay." Pl. Resp. SMF at ¶¶ 36-41. The Court overrules this objection because Schival's statements are not offered for the truth of the matter asserted, but only to explain the circumstances that caused Davie to transfer Seligman to the KOR. The details of the relationship between Schival and Seligman are immaterial to the issues in this case.

On or around Friday, November 30, 2012,[5] Plaintiff took a picture with her cell phone, from across the room, of Seligman from the neck down to show that Seligman exhibited an erection in the workplace. Def. SMF at ¶ 48; Pl. SMF at ¶ 45; Pl. Dep. at 93, 97, 139. Defendant contends that Michael Wright[6] had previously instructed Plaintiff not to take pictures of associates in the workplace, which Plaintiff denies. Def. SMF at ¶ 49; Pl. Resp. SMF at ¶ 49; Wright Dep. at 67-68; Pl. Dep. at 94-95. Between Monday, December 3, 2012 and Wednesday, December 5, 2012, Plaintiff showed or attempted to show the picture of Seligman's alleged erection to approximately three managers or leads and four non-management employees. Def. SMF at ¶ 50; Pl. Dep. at 140; Fortson Dep. at 112; Davis Dep. at 9; Def. Ex. G [53-9], Shields Dec. at ¶ 4. Plaintiff contends that she showed the picture to only three non-management employees. Pl. Resp. SMF at ¶ 50; Pl. Dep. at 140.

---

[5] Although Plaintiff alleged in the Complaint that she took the picture on or around November 30, 2012, she states that she "disputes" the actual date, citing her deposition testimony that she took the photograph "around the end of November." Pl. Resp. SMF at ¶ 48; Pl. Dep. at 93, 97; Comp. at ¶ 33. It is undisputed that Seligman began working at the KOR on November 27, 2012, and Plaintiff did not testify that she took the photo on his first day of work. Accordingly, the evidence reflects that Plaintiff took the photograph around November 28-30, 2012.

[6] Defendant refers to this individual as "Michal Wright," but that appears to be a typographical error. *See* Def. SMF at ¶ 49; Wright Dep. [53-5].

On or around December 3, 2012, Plaintiff approached Maloney to show him the picture on her phone of Seligman's alleged erection.[7] Def. SMF at ¶ 51; Pl. SMF at ¶ 48; Pl. Dep. at 142-43; Maloney Dep. at 104-05. Plaintiff said that Seligman had an erection in the picture. Def. SMF at ¶ 52; Maloney Dep. at 104. Maloney did not see anything in the picture, but told Plaintiff not to show the picture to anyone, and asked her if she wanted him to contact Human Resources ("HR"). Def. SMF at ¶ 53; Maloney Dep. at 104-05; Wright Dep. at 70. According to Maloney, Plaintiff told him she did not want to contact HR. Def. SMF at ¶ 54; Maloney Dep. at 104. Nevertheless, Maloney called Marilyn Leister, HR Representative, and Michael Wright, Senior Manager of Operations, about the issue. Def. SMF at ¶ 56; Davie Dep. at 289; Maloney Dep. at 114; Wright Dep. at 69-70. Maloney stated in his call with Wright

---

[7] Plaintiff disputes the exact date that she showed the photograph to Maloney, citing her deposition testimony that she was not sure of the date. Pl. Resp. SMF at ¶ 51; Pl. Dep. at 142-43. Plaintiff testified that she showed the photo to Maloney "a few days before I sent the formal e-mail." Pl. Dep. at 142. It is undisputed that Plaintiff sent the "formal email" on December 5, 2012; thus, Plaintiff's testimony supports Defendant's contention that Plaintiff showed the photo to Maloney "on or around December 3, 2012." She contends she took the photo between November 28-30, and that she showed Maloney the photo at least one day after she took it, but "a few days" before December 5. Pl. Dep. at 142-43 (when asked if she showed the photo to Maloney on December 3 or 4, she responded "I'm not sure which one"). Oddly, although Plaintiff states that she "disputes" the date in response to the Defendant's Statement of Facts, in her own Statement of Facts, she admits that she showed the photo to Maloney "around December 3, 2012." Pl. SMF at ¶ 48. This is but one example of the many fictitious or immaterial "disputes" in the Plaintiff's response to the Defendant's Statement of Facts.

that he had instructed Plaintiff not to show the picture of Seligman's crotch area in the workplace, but that she had continued to do so. Def. SMF at ¶ 57; Wright Dep. at 70. Following the conversation, Wright contacted Davie and requested an immediate investigation of Plaintiff's complaint about Seligman, as well as her actions in taking and showing a photograph of a co-worker's crotch area. Def. SMF at ¶ 58; Davie Dep. at 183.

From December 3, 2012 to December 5, 2012, Plaintiff approached other employees around the workplace to show them the picture of Seligman. Def. SMF at ¶ 59; Pl. Dep. at 140. According to Defendant, Plaintiff approached people in a comical manner, stating that Seligman had an erection and laughing about it. Def. SMF at ¶ 60; Davie Dep. at 293; Wright Dep. at 95; Shields Dec. at ¶ 7. Defendant contends that Plaintiff approached Wright in a jovial manner to show him the picture on her phone. Def. SMF at ¶ 61; Wright Dep. at 95. Wright knew about the conversation that Maloney had with her before, and advised Plaintiff not to show the picture to any other employees. Def. SMF at ¶ 62; Wright Dep. at 71, 95.

Plaintiff stopped Vandrena Armstrong, the mail room supervisor, on her way to the shipping dock to show her the picture of Seligman's alleged erection. Def. SMF at ¶ 63; Pl. Dep. at 141; Armstrong Dep. at 23-25. When Armstrong viewed the picture, she noted that Seligman looked normal. Def. SMF at ¶ 64; Pl. Dep. at 231;

Def. Ex. M, at MCP00096. Armstrong told Plaintiff that she should contact HR with any concerns. Def. SMF at ¶ 65; Def. Ex. M , at MCP00096. Armstrong then reported the issue to Wright. Def. SMF at ¶ 66; Wright Dep. at 71. Two mail room employees informed Maloney that Plaintiff had approached them and other employees and had showed them a picture of Seligman. Def. SMF at ¶ 67; Davie Dep. at 261; Maloney Dep. at 110-11. Maloney contacted Plaintiff and advised her again that it was not appropriate for her to show other employees the picture of Seligman's crotch area. Def. SMF at ¶ 68; Maloney Dep. at 112-13. According to Maloney, Plaintiff responded that the cell phone was hers and that she could do with it as she pleased. Def. SMF at ¶ 69; Maloney Dep. at 112-13.

On December 5, 2012 at 10:10 a.m., Plaintiff sent an email to MCP management and HR ("December 5 Email"). Def. SMF at ¶ 70; Pl. SMF at ¶ 60; Pl. Dep. at 91-92. Plaintiff stated in the email that she was fearful of Seligman because: (1) he made threats in a credit union; (2) he made terroristic threats; (3) he had admitted to stalking a Coke employee; and (4) he constantly had an erection. Def. SMF at ¶ 71; Pl. SMF at ¶ 61; Pl. Dep. at 91, Ex. 12; Davie Dep. at 61-62. The December 5 Email from Plaintiff did not contain any allegation of inappropriate verbal and/or physical sexual behavior by Seligman towards Plaintiff or any other employee. Def. SMF at ¶ 72; Pl. Dep. at 153-54, Ex. 12.

Plaintiff's December 5 Email was addressed to Leo Lieberman, Dave Napier, and "HR," and it stated in its entirety:

> I would like to start off by saying I am in fear for my safety in more ways than one. To know that one of my co-workers Danny.
> 1. He has made threats in the credit union (of a robbery)
> 2. He has made terroristic threats in the CRB (of murder)
> 3. He has admitted to stalking a Coke employee
> 4. Constantly having an erection
> & that make me very uncomfortable.
> To know that he's not wanted at the main building & place up here at KOR with us & these 4 points are all been brought to SECURITY AT COCA-COLA & TO MCP & he is still here is totally in heard of to me & of my co-workers. I have quite a few experiences with people making threats of murder has indeed went through with it. I can show proof of all my personal experiences. I really need to speak with someone ASAP concerning this issue.

Pl. Dep, Ex. 12 [57-12] [sic].

On December 5, 2012, Plaintiff met with Davie and Wright at approximately 10:15 a.m. Def. SMF at ¶ 73; Pl. SMF at ¶ 64; Davie Dep. at 251; Pl. Dep. at 142. Defendant contends that, during the meeting, Plaintiff stated that Seligman appeared to have an erection after leaving the bathroom and that she took a picture with her cell phone to show management. Def. SMF at ¶ 74; Davie Dep. at 192, 197. Plaintiff never told Davie or Wright that Seligman harassed her in any way or that he touched her. Def. SMF at ¶ 75; Pl. Dep. at 154-55. When Plaintiff was asked if she had shown the picture to employees other than management, she said yes. Def. SMF at ¶ 76; Davie Dep. at 196; Wright Dep. at 76.

Plaintiff also stated to Davie and Wright that she believed that Seligman was a threat to the workplace. Def. SMF at ¶ 77; Davie Dep. at 189-90. Plaintiff said that, although she had not experienced any action of this kind directly, she was aware of others who had. Def. SMF at ¶ 78; Davie Dep. at 189-90. When asked if she had personal or first-hand knowledge of any of these incidents, she responded "no." Def. SMF at ¶ 80; Davie Dep. at 191. According to Defendant, Plaintiff stated: "You don't know what people like that will do. My cousin works with people like him and he told me they can become violent at any time and you can't tell if and when it will happen." Def. SMF at ¶ 82; Davie Dep. at 190-91. Plaintiff also referenced Seligman's autism. Def. SMF at ¶ 40; Davie Dep. at 190.

Defendant contends that Plaintiff was advised that the incidents were fully investigated and resolved appropriately to the satisfaction of the Company, the person reporting the incident, and the client. Def. SMF at ¶ 85; Davie Dep. at 191. Defendant further contends that Plaintiff was told that it was inappropriate to take photos of another employee's crotch area and that it was also inappropriate to show photos of an employee's crotch area to other employees. Def. SMF at ¶ 86; Davie Dep. at 196. Defendant contends that Plaintiff was further advised that management was concerned with her statement to Maloney that she could do as she pleased with her cell phone, and, as a result, she was being sent home pending an investigation of the incidents

reported. Def. SMF at ¶ 87; Pl. Dep. at 240; Davie Dep. at 197. Plaintiff was told that she should refrain from showing the picture or speaking to "anyone else" about the investigation. Def. SMF at ¶ 88; Pl. Dep. at 241; Davie Dep. at 223.

On December 6, 2012, an HR Representative from TCCC contacted Defendant to advise Defendant that Plaintiff had contacted a member of TCCC's Corporate Security and made numerous allegations that Defendant and TCCC had placed employees of both companies in danger by not following established security policies and procedures regarding threats in the workplace. Def. SMF at ¶ 89; Davie Dep. at 227-28; Pl. Dep. at 158. The representatives told Davie that they were aware of the previous incidents Plaintiff referenced involving Seligman and felt comfortable that the incidents had been investigated and resolved appropriately. Def. SMF at ¶ 90; Davie Dep. at 229. TCCC indicated to Davie they had no concerns with Seligman and did not consider him to be a threat to the workplace. Def. SMF at ¶ 91; Davie Dep. at 229.

According to Defendant, the TCCC HR representative expressed TCCC's concern that Defendant had an employee taking and showing pictures of an employee's crotch parts in the TCCC workplace, spreading rumors and contacting TCCC management regarding matters appropriate only for MCP management. Def. SMF at ¶ 92; Davie Dep. at 229-31. After concluding that Plaintiff did take the

photograph of Seligman, and show it to others, and that she did not follow directives not to discuss confidential employment issues with others, MCP terminated Plaintiff's employment on December 7, 2012. Def. SMF at ¶ 93; Davie Dep. at 222-23.

<u>Plaintiff's Statement of Facts</u>

Plaintiff is a female who was hired by Defendant in June of 2008, as a mail room clerk at a rate of $10.00 per hour. Pl. SMF at ¶¶ 1, 5; Pl. Dep. at 53-54; Pl. Dec. [69-1] at ¶¶ 3, 5. Although Plaintiff received a copy of the 2006 employment handbook when she was hired in 2008, she did not receive any training regarding MCP's policies and procedures, including the sexual harassment policy. Pl. SMF at ¶ 2; Pl. Dep. at 78, 81-82; Pl. Dec. at ¶ 6. As of 2011, Defendant was subject to Title VII of the Civil Rights Act of 1964, as amended, and had 15 or more employees. Pl. SMF at ¶ 4. In 2010, Plaintiff was transferred to the receiving dock (also referred to as the "KOR"). Pl. SMF at ¶ 3; Pl. Dep. at 56. Roger Maloney was Plaintiff's supervisor while she worked at the KOR. Pl. SMF at ¶ 6; Pl. Dep. at 59; Pl. Dec. at ¶ 8.

Danny Seligman began working for Defendant in March of 2011. Pl. SMF at ¶ 7; Davie Dep. at 94; Seligman Dep. at 8. Seligman has Asperger's Syndrome. Pl. SMF at ¶ 8. Seligman was initially hired to work in the mail room, but was transferred to KOR in late 2012. Pl. SMF at ¶ 9; Seligman Dep. at 11; Davie Dep. at 108-09, 115-

16. According to Plaintiff, although Seligman was not told why he was transferred, he told Plaintiff that he was transferred for stalking a female employee. Pl. SMF at ¶ 11; Pl. Dep. at 119; Seligman Dep. at 14.

Before his transfer to the KOR, Seligman was observed unclothed in a workplace restroom used by many employees of MCP. Pl. SMF at ¶ 12; Davie Dep. at 125-26; Fortson Dep. at 74. Defendant does not dispute this, but notes that Seligman was in the men's restroom, and was in the process of changing his clothes because he had accidentally soiled himself. Def. Resp. SMF at ¶ 12; Davie Dep. at 125. Seligman had also been observed in the lobby area acting awkwardly and strange and an employee thought she heard him say the word "kill." Pl. SMF at ¶ 13; Davie Dep. at 126, 137-38. Plaintiff does not allege that she ever saw Seligman unclothed or that she ever heard him say the word "kill." Pl. SMF at ¶¶ 12-13. Plaintiff also contends that Seligman had once told another employee that they should rob the credit union. Pl. SMF at ¶ 14; Davie Dep. at 125-26. Plaintiff does not claim that she heard Seligman make this alleged statement. Pl. SMF at ¶ 14.

Plaintiff began to work with Seligman when he was transferred to the KOR in or around November 27, 2012. Pl. SMF at ¶ 15; Seligman Dep. at 16; Davie Dep. at 122; Pl. Dec. at ¶ 11. According to Plaintiff, when Seligman did not have a specific

task, he would frequently return to Plaintiff's area.[8] Pl. SMF at ¶ 16; Pl. Dep. at 74, 210; Pl. Dec. at ¶ 15; Fortson Dep. at 61-63. Plaintiff contends that Seligman "would invade her personal space by standing within approximately one foot of her while she was working." Pl. SMF at ¶ 17; Pl. Dep. at 74, 108; Dec. at ¶ 16; Fortson Dep. at 104-05. Plaintiff's job was physical in nature and required her to bend over and reach. Pl. SMF at ¶ 19; Pl. Dep. at 108. She contends that Seligman "frequently" tried to look down her shirt and at her underwear. Pl. SMF at ¶ 20; Pl. Dep. at 200; Pl. Dec. at ¶ 19.

According to Plaintiff, she observed that on a "near daily basis, Seligman exhibited an erection that lasted most of the workday." Pl. SMF at ¶ 21; Pl. Dep. at 96, 138, 233; Pl. Dec. at ¶ 20. Plaintiff contends that Seligman stared at her "on a daily basis" while she worked. Pl. SMF at ¶ 18; Pl. Dep. at 108, 200; Pl. Dec. at ¶ 17. Plaintiff claims that Seligman would often have an erect penis when he was staring at her. Pl. SMF at ¶ 23; Pl. Dep. at 210-11; Pl. Dec. at ¶ 22.

Plaintiff also claims that Seligman "frequently" and "deliberately" "bumped against" her and "rubbed up" against her when he had an erection. Pl. SMF at ¶ 22;

---

[8] The Defendant has objected to this fact, and much of the Plaintiff's other facts, that are supported by citations to the Plaintiff's Declaration submitted with her response to the Defendant's Motion for Summary Judgment. *See* Def. Resp. SMF at ¶¶ 16-28. Defendant has moved to exclude the admission of Plaintiff's Declaration on the ground that it contradicts her previous sworn testimony in her deposition. The Court discusses these objections in connection with Defendant's Motion to Exclude, discussed *infra*.

Pl. Dep. at 108-09, 112-13, 204, 215, 278; Pl. Dec. at ¶ 21. Although Plaintiff claims that this "bumping" or "rubbing" happened "frequently," she testified during her deposition that this happened "once or maybe this was more than once, he'll just walk into me and brush up against me and then he will rub his side up against me." Pl. Dep. at 109. She further testified that "[he] rubbed his body up against me," but stated that he touched her only with his "upper body, because his lower body I didn't give it time to make contact." Pl. Dep. at 205. At another point, she testified that Seligman walked into her "maybe twice a week." Pl. Dep. at 209. She also testified that, although she believed that Seligman had an erection, she "never felt it" but he was "bumping up and brushing up against me and walking into me." Pl. Dep. at 215. She testified that she "[n]ever touched the erection." *Id.* She also testified that Seligman never said anything of a sexual nature to her when he walked into her. Pl. Dep. at 209.

According to Plaintiff, she was uncomfortable with Seligman's behavior, but because she knew that he was disabled she initially tried to ignore his behavior. Pl. SMF at ¶ 24; Pl. Dec. at ¶ 23. She claims that Seligman's actions had a significant negative impact on her job performance because she was forced to focus her attention on preventing Seligman from rubbing against her and staring at her. Pl. SMF at ¶ 25; Pl. Dep. at 257; Pl. Dec. at ¶ 24. She claims that her job performance was also affected because she did not want to bend down, a necessary part of her job, in front of

Seligman because she feared he would try to look down her shirt or stare at her. Pl. SMF at ¶ 26; Pl. Dep. at 257; Pl. Dec. at ¶ 24. Plaintiff contends that she had to be more cautious when Seligman was present, which made her work more slowly, and as a result, caused her work to back up. Pl. SMF at ¶ 27; Pl. Dep. at 258; Pl. Dec. at ¶ 26.

Plaintiff asked Seligman to give her more personal space because as time progressed,[9] she felt too uncomfortable to ignore his behavior. Pl. SMF at ¶ 28; Pl. Dep. at 208-09; Pl. Dec. at ¶ 28. According to Plaintiff, Seligman appeared to not understand her when she asked him to give her more personal space and did not respect her request. Pl. SMF at ¶ 29; Pl. Dep. at 208-09; Pl. Dec. at ¶ 29. Plaintiff's co-worker, Sam Fortson, was one of the most senior employees on the KOR. Pl. SMF at ¶ 32; Fortson Aff. [64-16] at ¶ 9. Fortson witnessed Seligman stand uncomfortably close to Plaintiff, appear to intentionally bump or rub against her, and also exhibit an apparent erection while around Plaintiff. Pl. SMF at ¶ 32; Fortson Aff. at ¶¶ 14-15. Defendant contends that Fortson also witnessed Seligman walking around with an erection while "everybody is on the dock," and testified that he saw Seligman

_____

[9] It appears to be undisputed that Plaintiff and Seligman worked together for a total of six business days, from Tuesday, November 27, 2012, the day Seligman began working at the KOR, until Wednesday, December 5, 2012, the day that Plaintiff was sent home pending an investigation. *See* Def. SMF at ¶ 87; Pl. Dep. at 244; Seligman Dep. at 16; Davie Dep. at 197.

bumping into several male employees as well. Def. Resp. SMF at ¶ 32; Fortston Dep. at 13-15, 32-33. Fortson also witnessed Plaintiff crying after having to work with Seligman. Pl. SMF at ¶ 33; Fortson Aff. at ¶ 16.

According to Plaintiff, she first complained to her manager, Maloney, about Seligman's inappropriate behavior soon after he was transferred to the KOR. Pl. SMF at ¶ 34; Pl. Dep. at 111; Pl. Dec. at ¶ 30. Plaintiff told Maloney that she felt uncomfortable working with Seligman because he invaded her personal space, stared at her, bumped against her, and "rubbed up against her with an erection."[10] Pl. SMF at ¶¶ 35, 39; Pl. Dep. at 112, 114; Pl. Dec. at ¶¶ 32, 34. Plaintiff approached Maloney with complaints about Seligman "several times" during the period of time she worked with Seligman. Pl. SMF at ¶ 36; Pl. Dep. at 114; Pl. Dec. at ¶ 31. Maloney told Plaintiff that Seligman did not mean any harm and that she should tolerate his "inappropriate conduct" because he was autistic. Pl. SMF at ¶¶ 37, 44; Pl. Dep. at 112-13; Pl. Dec. at ¶ 35. Plaintiff complained to Maloney because she continued to feel threatened, unsafe, and humiliated due to Seligman's behavior, and she could not work in a situation where she was so "frequently sexually harassed." Pl. SMF at ¶ 38; Pl. Dep. at 212, 257; Pl. Dec. at ¶ 33.

---

[10] Although Plaintiff states that she told Maloney that Seligman "rubbed up against her with an erection," she testified during her deposition that Seligman only "bumped" her with his "side" and his "upper body," and did not touch her with his lower body or his erection. *See* Pl. Dep. 108-09, 205, 209, 215.

Additionally, four of Plaintiff's co-workers–Tameka Johnson, Sam Fortson, Demetrius Daniels, and Ronnie Swinton–also met with Maloney and expressed that they were uncomfortable working with Seligman. Pl. SMF at ¶ 40; Johnson Aff. at ¶ 9; Forston Aff. at ¶ 9. Plaintiff claims that, despite her complaint about "sexual harassment," and the other complaints about Seligman, "Maloney took no action to protect Plaintiff."[11] Pl. SMF at ¶ 42; Pl. Dep. at 112-13; Pl. Dec. at ¶ 35. According to Plaintiff, Maloney explained his failure to act to Fortson by saying that Seligman "had friends in high places at Coca-Cola, and it was out of his hands." Pl. SMF at ¶ 35; Fortson Aff. at ¶ 11.

In order to support her complaint of "sexual harassment" and to show that Seligman "exhibited an erection in the workplace," Plaintiff took a picture of Seligman from the neck down. Pl. SMF at ¶ 45; Pl. Dep. at 93, 97, 139; Pl. Dec. at ¶¶ 37-39. According to Plaintiff, she had been advised by the general manager, Leo Lieberman, to take a photo of things that were inappropriate in the past. Pl. SMF at ¶ 46; Pl. Dep. at 94. Plaintiff claims that she did not include Seligman's head in the picture in an effort not to embarrass him, but she also testified during her deposition

---

[11] Although Plaintiff claims that Maloney "took no action," she does not dispute that he contacted Wright and Leister regarding her allegations, and that Wright contacted Davie in Human Resources. Def. SMF at ¶¶ 56-58; Davie Dep. at 289; Maloney Dep. at 114; Wright Dep. at 69-70.

that Seligman was the only white employee who worked on the dock. Pl. SMF at ¶ 47; Pl. Dep. at 139; Pl. Dec. at ¶¶ 37-38.

On or around December 3, 2012, Plaintiff showed Maloney the photograph she had taken of Seligman and complained that Seligman "exhibited an erection during the work hours on a daily basis." Pl. SMF at ¶ 48; Pl. Dep. at 115-16; Pl. Dec. at ¶ 40. Plaintiff claims that she again told Maloney that did not feel comfortable working with Seligman and she felt "sexually harassed by him." Pl. SMF at ¶ 48; Pl. Dep. at 115-16; Pl. Dec. at ¶ 40. Although Plaintiff claims that she told Maloney that she felt "sexually harassed" by Seligman, Defendant notes that during her deposition, Plaintiff did not testify that she said anything to Maloney about being "sexually harassed." Def. Resp. SMF at ¶ 48; Pl. Dep. at 115-16. Plaintiff testified that she told Maloney, "Now I have proof of what I'm saying. This is inappropriate. I'm very uncomfortable. It's affecting me doing my job. I don't even want to bend down and lift stuff up." Pl. Dep. at 115. She also testified that she told Maloney: "This is what I have to work with on a daily basis and I think it's very inappropriate for me to have to work under these conditions." *Id.* at 116.

According to Plaintiff, Maloney laughed in response to the picture and told Plaintiff not to worry about it. Pl. SMF at ¶ 49; Pl. Dep. at 115-16; Pl. Dec. at ¶ 41. Plaintiff told Maloney that she would like to make a formal complaint to HR, and

Maloney informed Plaintiff that he would contact HR and report her complaint. Pl. SMF at ¶¶ 50-51; Pl. Dep. at 115-17; Pl. Dec. at ¶¶ 42-43. Plaintiff claims that she did not receive any response from HR after her complaint to Maloney. Pl. SMF at ¶ 52; Pl. Dep. at 116-17; Pl. Dec. at ¶ 44. Plaintiff does not dispute, however, that she met with Wright and Davie on or about December 5, 2012, just two days after she showed Maloney the photograph of Seligman. Pl. Dep. at 151-52.

Because of the negative affect Seligman's behavior had on her work performance, and due to the fact that Plaintiff received "no response from management" in response to her complaints, Plaintiff decided to approach other coworkers who she "reasonably thought would have similar concerns." Pl. SMF at ¶ 53; Pl. Dep. at 117, 148; Pl. Dec. at ¶ 45. Plaintiff believed that if there were complaints from other employees, her concerns would be taken seriously. Pl. SMF at ¶ 54; Pl. Dep. at 148-49; Pl. Dec. at ¶ 46.

One day after she showed the photograph to Maloney, on or around December 4, 2012, Plaintiff approached Wright and Armstrong with her complaint after she approached her coworkers. Pl. SMF at ¶ 55; Pl. Dep. at 141; Pl. Dec. at ¶ 47; Wright Dep. at 61; Armstrong Dep. at 23. When Plaintiff attempted to show Wright the picture, Wright laughed and told Plaintiff she did not have to show him. Pl. SMF at ¶ 56; Pl. Dep. at 142; Pl. Dec. at ¶ 48; Wright Dep. at 61. Armstrong also laughed and

told Plaintiff that Seligman was "always like that," referring to Seligman's erection. Pl. SMF at ¶¶ 57-58; Pl. Dep. at 101, 231-32; Pl. Dec. at ¶ 49. Plaintiff claims that, after her complaints to Wright and Armstrong, Plaintiff did not receive any response from HR. Pl. SMF at ¶ 59; Pl. Dec. at ¶ 50. As noted, however, Plaintiff does not dispute that she met with Wright and Davie on or about December 5, 2012, the day after she claims she complained to Wright and Armstrong. Pl. Dep. at 151-52.

On or around December 5, 2012, Plaintiff sent the December 5 Email to HR and two managers of Defendant. Pl. SMF at ¶ 60; Pl. Dep. at 91; Pl. Dec. at ¶ 51. In the December 5 Email, Plaintiff stated her concerns regarding Seligman, including his "constant erection in the workplace during work hours," and requested to speak to someone about her complaint. Pl. SMF at ¶ 61; Pl. Dep. at 153, Ex. 12; Pl. Dec. at ¶ 52. Plaintiff claims that, shortly after she sent that December 5 Email, Maloney called her and told her not to show the picture to anyone, but he had not told her that previously. Pl. SMF at ¶¶ 63, 69; Pl. Dep. at 155-56, 249; Pl. Dec. at ¶ 54.

On that same day, December 5, 2012, Davie and Wright approached Plaintiff and asked to meet with her. Pl. SMF at ¶ 62; Pl. Dep. at 151-52; Pl. Dec. at ¶ 53. During the meeting with Davie and Wright, Plaintiff claims that she was told that the meeting was a "direct result of her trying to show a picture of Seligman to Wright." Pl. SMF at ¶¶ 64-65; Pl. Dep. at 151; Pl. Dec. at ¶ 55; Wright Dep. at 74; Davie Dep.

at 187. At Davie's request, Plaintiff sent the picture of Seligman to Davie during the meeting. Pl. SMF at ¶ 67; Pl. Dec. at ¶ 57; Davie Dep. at 188.

According to Plaintiff, during the December 5, 2012 meeting, she raised her "complaints regarding Seligman's constant erection, prior complaints of sexual harassment and threatening conduct in the workplace against Seligman, and how uncomfortable she felt working with Seligman." Pl. SMF at ¶ 66; Pl. Dec. at ¶ 56; Davie Dep. at 188-92, 195. Defendant objects to this contention on the ground that Plaintiff's cited portions of Davie's deposition do not support her allegation, and Plaintiff's own deposition testimony completely contradicts this claim. Def. Resp. SMF at ¶ 66. Davie testified that Plaintiff said to him, "I think it's not right for Danny to have an erection in the workplace," but when he asked her if Seligman ever made any "inappropriate comments" to her or ever touched her, she said "no." Davie Dep. at 188-89. During Plaintiff's own deposition, she testified that she did not say anything at all about Seligman to Wright and Davie during that meeting: "When they called me in, I didn't get really time to say anything. They asked for the photo. I gave them the photo. It wasn't really much said on my behalf. They didn't want to know anything about my situation. . . . I tried to get a word in and I really couldn't get any words in. They told me what this situation was going to be and I was suspended." Pl. Dep. at 256.

28

Plaintiff was suspended without pay and told not to return to work until she was contacted by Defendant. Pl. SMF at ¶ 68; Pl. Dep. at 240; Pl. Dec. at ¶ 61; Davie Dep. at 197. Plaintiff was told that the reason for her suspension was to allow Defendant to conduct an investigation. Pl. SMF at ¶ 72; Pl. Dep. at 240; Pl. Dec. at ¶ 62. According to Plaintiff, Davie never told her not to discuss her complaint while the investigation was pending. Pl. SMF at ¶ 70; Pl. Dep. at 158; Pl. Dec. at ¶ 63. Plaintiff claims that she spoke with someone in the security department of TCCC only after she was terminated and not before. Pl. SMF at ¶ 71; Pl. Dep. at 158-60, 168; Pl. Dec. at ¶ 67.

When an employee makes a complaint of sexual harassment, Defendant's typical investigation procedures include interviewing the employee who made the complaint and the alleged harasser, and also obtaining a written statement from both. Pl. SMF at ¶ 73; Davie Dep. at 33-35. While Davie spoke with witnesses about Plaintiff's complaint, Seligman was never interviewed. Pl. SMF at ¶ 74; Davie Dep. at 216, 260. Defendant also did not obtain a statement from Plaintiff. Pl. SMF at ¶ 75; Pl. Dec. at ¶ 75; Davie Dep. at 220-21.

On or around December 7, 2012, Plaintiff was fired by Defendant. Pl. SMF at ¶ 76; Pl. Dep. at 160; Pl. Dec. at ¶ 65; Davie Dep. at 249. Plaintiff contends that she was told that she was terminated for taking the picture of Seligman. Pl. SMF at ¶ 77;

29

Pl. Dep. at 184, 248; Pl. Dec. at ¶ 66; Davie Dep. at 222. The only reason listed on Plaintiff's Separation Notice was: "Taking sexually suggestive pictures of a male associate's private area without his permission or knowledge. Stored them in her camera and displayed the pictures to several other associates…." Pl. SMF at ¶ 78; Davie Dep. at 223-24, Ex. 4.

On December 11, 2012, Plaintiff filed a Charge of Discrimination against MCP with the Equal Employment Opportunity Commission ("EEOC").[12] Def. SMF at ¶ 94; Pl. Dep. 88; *see* Def. Ex. J [53-12], "Notice of Charge of Discrimination." Plaintiff alleges that the EEOC issued a Notice of Right to Sue to her on or around December 10, 2013, and that she filed the Complaint within ninety days of her receipt of that Notice. Comp. [1-1] at ¶¶ 52-58. It appears to be undisputed that Plaintiff exhausted the administrative remedies required under Title VII before bringing this action.

Additional facts will be set forth as necessary during the discussion of Defendant's Motion for Summary Judgment.

---

[12] Defendant actually states that Plaintiff filed her EEOC Charge on "December 11, 2014," and Plaintiff does not dispute that she filed her EEOC Charge on that date. Def. SMF at ¶ 94; Pl. Resp. SMF at ¶ 94. That date appears to be a typographical error, however, as Plaintiff alleges in the Complaint that she filed her EEOC Charge on December 11, 2012, a few days after MCP terminated her employment, and within the time period required by Title VII. Comp. at ¶ 52.

## II.   DISCUSSION

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of

a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat

a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986).

When considering motions for summary judgment, the court does not make

decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249;

*Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991).

Rather, the court only determines whether there are genuine issues of material fact to

be tried. Applicable substantive law identifies those facts that are material and those

that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or

affect the outcome of a suit will not properly preclude the entry of summary judgment.

*Id.*

If a fact is found to be material, the court must also consider the genuineness

of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by

evidence, or if it is created by evidence that is "merely colorable" or is "not

significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S.

at 242. Moreover, for factual issues to be genuine, they must have a real basis in the

record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply

show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

B.    DEFENDANT'S MOTION TO EXCLUDE

In connection with her response to the Defendant's Motion for Summary Judgment, Plaintiff submitted her own Declaration and that of Tameka Johnson, who she claims was a co-worker at MCP. *See* Pl. Dec. [69-1]; Johnson Dec. [69-2]. Defendant MCP has filed a Motion to Exclude Declarations Filed in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment [74] ("Motion to Exclude"). Defendant argues that Plaintiff's Declaration is a "sham" because the Plaintiff includes information in her Declaration that directly contradicts her previous sworn deposition testimony. Defendant argues further that Johnson's Declaration must be excluded from consideration by the Court because the Plaintiff failed to produce it to the Defendant in accordance with the requirements of FED. R. CIV. P. 26(a) and (e).

33

In creating an issue of fact, a party may not rely on an affidavit from an individual that directly contradicts his or her own deposition testimony. An affidavit may be considered a "sham" affidavit "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986); *see also Dotson v. Delta Consol. Indus., Inc.*, 251 F.3d 780, 781 (8th Cir. 2001) ("a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition"). A court presented with such an inconsistency in a party's testimony may disregard the later "sham affidavit" in favor of the earlier deposition testimony. *Tippens*, 805 F.2d at 949; *see also Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984); *Anderson v. Radisson Hotel Corp.*, 834 F. Supp. 1364, 1373 (S.D. Ga. 1993).

This "sham affidavit" rule, however, as set forth in this Circuit and elsewhere, operates to nullify only unexplained variations in testimony. *See Van T. Junkins & Assoc.*, 736 F.2d at 656 ("a district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation."); *accord S.W.S. Erectors, Inc. v. Infax, Inc.*, 72

F.3d 489, 495-96 (5th Cir. 1996); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). When the witness furnishes a credible explanation for his reversal, courts are properly unwilling to discard the revised testimony as a sham. *See, e.g.*, *Pries v. Honda Motor Co.*, 31 F.3d 543 (7th Cir. 1994) (declining to discard affidavit as sham because plaintiff credibly explained variation in testimony based on later understanding of events); *Waitek v. Dalkon Shield Claimants Trust*, 908 F. Supp. 672 (N.D. Iowa 1995) (finding no sham because medical expert witness gave reasonable explanation for revised opinion presented in affidavit).

Furthermore, the Eleventh Circuit has cautioned courts that, in reviewing affidavits submitted in connection with a motion for summary judgment, an affidavit may not be simply disregarded as a "sham" because it contains information contradictory to other evidence in the record.

> [E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition.

*Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) (*quoted in Tippens*, 805 F.2d at 954).[13]

---

[13] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

In light of these considerations, the Court concludes that the Plaintiff's entire Declaration is not a "sham" affidavit that must be disregarded by the Court entirely. Some of Defendant's arguments involve issues of credibility, impeachment, and the weight that the testimony should be given, all of which are the province of the factfinder and not the Court. "Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact." *Tippens*, 805 F.2d at 954. Nevertheless, the Court finds that, with respect to several key issues in the case, the Plaintiff has included information in her Declaration that appears to contradict her previous sworn testimony. Some of those contradictions are addressed above in the facts. In particular, the Defendant focuses on Plaintiff's testimony regarding her claim that Seligman would "bump" into her while he allegedly had an erection.

In her Statement of Facts, Plaintiff claims that Seligman "frequently" and "deliberately" "bumped against" her and "rubbed up" against her when he had an erection. Pl. SMF at ¶ 22. In support of this, she cites to her Declaration. *See* Pl. Dec. at ¶ 21 ("Frequently, Seligman deliberately bumped against and rubbed up against me when he had an erection."). Although Plaintiff now claims that this "bumping" or "rubbing" happened "frequently," she testified during her deposition that this happened "once or maybe this was more than once, he'll just walk into me and brush

up against me and then he will rub his side up against me." Pl. Dep. at 109. She

further testified that Seligman walked into her "maybe twice a week." Pl. Dep. at 209.

She also testified that, although she believed that Seligman had an erection, she "never

felt it" but he was "bumping up and brushing up against me and walking into me." Pl.

Dep. at 215. She also testified that she "[n]ever touched the erection." *Id.*

It is undisputed that Plaintiff and Seligman worked together a total of six

business days, from Tuesday, November 27, 2012, through Wednesday, December 5,

2012. Plaintiff testified during her deposition that Seligman "bumped" her with his

side "once or maybe this was more than once." She also testified that he did this

"maybe twice a week." Because Plaintiff and Seligman only worked together on six

business days, the Plaintiff's deposition testimony is that this happened twice at the

most, which cannot reasonably be described as "frequently," as the Plaintiff now

claims in her Declaration. Thus, to the extent that the Plaintiff's testimony in her

Declaration contradicts her prior sworn deposition testimony, on that issue or any

other material issue, the Court will disregard the Plaintiff's testimony in her

Declaration and will instead rely on the Plaintiff's deposition testimony.

Defendant also requests that the Court exclude Tameka Johnson's Declaration

in its entirety because, it argues, Plaintiff failed to produce it to the Defendant in a

timely fashion, as required by FED. R. CIV. P. 26(a) and (e). The Court denies the

Defendant's request to exclude Johnson's Declaration on this ground. The Court finds, however, that Johnson's testimony is largely immaterial and has excluded it on that basis. Accordingly, Defendant's Motion to Exclude [74] is **GRANTED IN PART, DENIED IN PART**.

####    C.    PLAINTIFF'S TITLE VII CLAIMS

In the Complaint, Plaintiff has asserted two counts against the Defendant MCP. In Count One, Plaintiff asserts a claim for "Violation of Title VII Sexual Harassment." Comp. at ¶¶ 59-65. In Count Two, she asserts a claim for "Title VII Prohibited Retaliation." *Id.* at ¶¶ 66-70. Defendant has moved for summary judgment on both counts.

####    1.    *Sexual Harassment*

In Count One of the Complaint, Plaintiff asserts a claim for "Violation of Title VII Sexual Harassment." Comp. at ¶¶ 59-65. She alleges that "Seligman engaged in unwelcome sexual harassment of Plaintiff," and the "harassment of Plaintiff was because of her gender." *Id.* at ¶¶ 61-62. She further alleges that the "unwelcome sexual harassment was sufficiently severe and/or pervasive to alter the terms and conditions of Plaintiff's employment and/or to create a hostile and discriminatorily abusive working environment." *Id.* at ¶ 63. She claims that "Defendant Employer

knew or should have known of Seligman's sexual harassment of Plaintiff, and failed to take prompt and appropriate remedial measures to stop the harassment." *Id.* at ¶ 64.

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer is liable for a violation of Title VII based on sexual harassment when the harassing conduct "unreasonably interferes with an employee's job performance by creating a hostile, intimidating, or offensive work environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986).

In order to establish a *prima facie* case for a Title VII claim against an employer for a hostile work environment based on harassment, a plaintiff must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex (or race or another protected class under Title VII); (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there is a basis for holding the employer liable for the harassment either directly or indirectly. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Henson v. City of Dundee*, 682 F.2d 897, 903-905 (11th Cir. 1982); *see*

*also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

To demonstrate the fourth element of a *prima facie* case of a hostile work environment, a plaintiff must show that her work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A court must consider the "totality of the circumstances" in determining whether a hostile environment is severe or pervasive enough to be actionable under Title VII; it must consider not only the frequency of the incidents alleged but also the gravity of those incidents. *Harris*, 510 U.S. at 23; *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir. 1989). Other factors that are relevant are whether the offensive conduct is physically intimidating or humiliating, and whether it unreasonably interferes with plaintiff's work performance. *Harris*, 510 U.S. at 23.

As the Supreme Court has stated, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). In evaluating whether a reasonable person would find conduct to be sufficiently severe or pervasive, "the objective

severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*) ("courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.").

Defendant MCP argues that it is entitled to summary judgment on Plaintiff's claim of sexual harassment under Title VII because the undisputed evidence in the record indicates that Plaintiff was not subjected to a hostile work environment on the basis of her sex. Although Plaintiff is female, and thus a member of a protected class, Defendant argues that she has not presented sufficient evidence to establish any of the remaining elements of a *prima facie* case of a hostile work environment based on sexual harassment. Defendant argues that she has not shown that she was subjected to "unwelcome harassment," that the alleged harassment was because of her sex, or that the harassment was sufficiently "severe or pervasive" to create a hostile work environment on the basis of sex. The Court agrees, and finds that Defendant is entitled to summary judgment on this claim.

The Court will not restate all of the Plaintiff's factual contentions that are described in detail above. In sum, it is undisputed that Plaintiff and Danny Seligman, her co-worker and the alleged harasser, worked together for six business days on the KOR, from Tuesday, November 27, 2012, through Wednesday, December 5, 2012. Plaintiff claims that Seligman had a "constant" erection in the workplace, and that he "bumped" against her or "rubbed" against her on one or two occasions during the six days they worked together on the KOR. Pl. SMF at ¶¶ 21-22. Plaintiff contends that Seligman also stared at her "on a daily basis" while she worked. Pl. SMF at ¶ 18.

As discussed above, although Plaintiff is claiming that Seligman "bumped" into her "frequently," she testified in her deposition that this happened "once or maybe this was more than once, he'll just walk into me and brush up against me and then he will rub his side up against me." Pl. Dep. at 109. At another point, she testified that Seligman walked into her "maybe twice a week." Pl. Dep. at 209. Thus, because it is undisputed that Plaintiff and Seligman worked together from November 27, 2012, until December 5, 2012, she claims that he "bumped" against her at most twice.

She also flatly denied during her deposition that Seligman ever touched her with his erection. She testified that "[he] rubbed his body up against me," but stated that he touched her only with his "upper body, because his lower body I didn't give it time to make contact." Pl. Dep. at 205. She also testified that, although she believed that

Seligman had an erection, she "never felt it" but he was "bumping up and brushing up against me and walking into me." Pl. Dep. at 215. She testified that she "[n]ever touched the erection." *Id.* She also testified that Seligman never said anything of a sexual nature to her when he walked into her. Pl. Dep. at 209. Indeed, Plaintiff does not allege, nor has she cited to any evidence in the record, that Seligman ever said anything of a sexual nature to her, ever, on any occasion.

Plaintiff also claims that Seligman "frequently" tried to look down her shirt and at her underwear. Pl. SMF at ¶ 20; Pl. Dep. at 200. In her deposition, she did not testify that he did this "frequently." She testified as follows: "And if I bend down, he'll look at my panties or something. And if I was bending over the other way, he might look down my shirt." Pl. Dep. at 200. She also clarified that her underwear was not exposed, but "sometimes, you know, you can see a line or something maybe through your pants." *Id.*

To show that the harassment is "based on sex," Plaintiff need not show that the alleged harasser's comments or conduct are explicitly sexual in nature. Rather, so long as Plaintiff's working conditions have been discriminatorily altered because of her gender, Title VII is implicated. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Scalia, J., concurring); *Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994). Conversely, workplace banter does not automatically

constitute unlawful harassment just because the words used have a sexual connotation or sexual content. "The critical issue, Title VII's test indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Svcs. Inc.*, 523 U.S. 75, 80 (1998) (citations omitted).

Some of the behavior Plaintiff alleges to have contributed to a sexually hostile environment was not based on sex, and thus will not be considered to have contributed to the allegedly hostile work environment. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247-48 (11th Cir. 1999) (*en banc*) (citing *Brill v. Lante Corp.*, 119 F.3d 1266, 1274 (7th Cir. 1997), for the proposition that non-sexual conduct cannot buttress a hostile work environment claim); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir.2000) ("Although [the Eleventh Circuit] examine[s] the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, the statements and conduct must be of a sexual or gender-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met.").

The Court finds that, viewing all of the evidence in the light most favorable to Plaintiff, she has failed to present sufficient evidence that Seligman subjected her to "harassment" or that the alleged harassment was based on the Plaintiff's sex. Although

Plaintiff alleges that Seligman "bumped" into her while he had an erection, her deposition testimony indicates that he did this at most twice in the very short time they worked together. Significantly, Plaintiff also claims that Seligman had a "constant" erection in the workplace, even when he was across the room from her, as he was when she took the fateful photograph of him. Her allegation that Seligman had a "constant" erection belies her contention that Seligman's erection somehow relates to the Plaintiff's sex. She has not cited to any evidence suggesting that it had anything to do with her at all.

Defendant, on the other hand, has presented evidence that Seligman often exhibited mannerisms that are deemed "awkward and inappropriate," including staring, standing in people's personal space, brushing up against employees, and talking in people's faces. Def. SMF at ¶ 22. Defendant has cited to evidence that both male and female employees in KOR experienced Seligman's staring, standing too close, or brushing up against them. Def. SMF at ¶ 23. Plaintiff has not cited to evidence in the record that controverts that evidence. Thus, Plaintiff has failed to support her claims with citations to evidence showing that Seligman singled her out for "harassment" because of her sex. More importantly, however, even if the Court assumes that Plaintiff presented sufficient evidence to create an issue of fact as to whether Seligman subjected her to unwelcome harassment, and the harassment was

because of Plaintiff's sex, the undisputed evidence in the record demonstrates that the alleged harassment was neither severe nor pervasive enough to create a hostile work environment under Title VII as a matter of law.

The Eleventh Circuit has said that sexual harassment is subjectively severe or pervasive if the complaining employee perceived it to be at the time. *Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501, 509 (11th Cir. 2000). In this case, the Court will assume for the purpose of this discussion that Plaintiff perceived the alleged harassment to be severe at the time it took place. Accordingly, the inquiry is whether a reasonable person in Plaintiff's position would find the harassment severe or pervasive. *Johnson*, 234 F.3d at 508.

The Eleventh Circuit has identified the following factors that should be considered in determining whether conduct is objectively severe or pervasive: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Mendoza*, 195 F.3d at 1246 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88; *Johnson*, 234 F.3d at 509 (11th Cir. 2000)). Proof is not required on each factor individually; the Court employs a totality of the circumstances approach. *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1248 (11th Cir.2004); *see also Harris*, 510 U.S. at

23. Whether conduct could be objectively perceived as severe or pervasive is an issue for the jury unless no reasonable jury could find the conduct to be severe or pervasive.

The best guidance provided by the Eleventh Circuit as to what constitutes severe or pervasive behavior is *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir. 1999) (*en banc*). In the *Mendoza* case, the court found the following conduct, which occurred over eleven months, was not severe or pervasive: one instance in which the alleged harasser said "I'm getting fired up," one occasion in which the alleged harasser rubbed his hip against the plaintiff's hip while touching her shoulder and smiling, two instances in which the alleged harasser made a sniffing sound while looking at the plaintiff's groin area and one instance of sniffing without looking at her groin, and "constant" following and staring "in a 'very obvious fashion'" by the alleged harasser. *Id.* at 1247. When the facts and circumstances surrounding the alleged harassment of Plaintiff in this case are compared to those of *Mendoza*, the Court finds that the alleged conduct in this case was not significantly more severe or pervasive than the conduct found in *Mendoza*.

In *Gupta v. Florida Board of Regents*, 212 F.3d 571 (11th Cir. 2000), the court also found that the conduct complained of did not rise to actionable sexual harassment. In that case, the plaintiff complained about conduct that included several requests by the alleged harasser that she go to lunch with him, and several phone calls

to her home at night during which he asked her questions that she considered to be about personal matters. Significantly, the phone calls did not include any sexual remarks or innuendoes. *Gupta*, 212 F.3d at 584-85. While the plaintiff in *Gupta* also complained that the alleged harasser unzipped his pants in front of her, the circumstances surrounding that incident revealed that she had entered his office while he was putting on his shirt and tucking it in. *Id.* at 585 ("But Gupta acknowledged that the air conditioning was broken on the day in question and that it was 'very hot in the building.' Gupta did not contend that Rhodd made any inappropriate gestures or comments toward her when he tucked in his shirt. His conduct on this isolated occasion was not 'physically threatening or humiliating.'").

The undersigned finds that the alleged acts of harassment in this case were no more egregious than those alleged in either *Mendoza* or *Gupta*, and therefore, Plaintiff has failed to present sufficient evidence that the conduct was either severe or pervasive enough to constitute a hostile work environment under Title VII. Plaintiff alleges that Seligman "bumped" into her once or twice with his side. The plaintiff in *Gupta* claimed that the alleged harassment consisted of one touch on the knee and one touch of the hem of her dress, but the court noted that "[e]ach incident was only momentary, and neither was coupled with any verbal suggestions or advances." *Gupta*, 212 F.3d at 585.

Similarly, the touching in *Mendoza* was characterized by the court as "slight physical contact." *Mendoza*, 195 F.3d at 1249. Thus, the Court finds that Plaintiff has failed to demonstrate that Seligman's conduct toward her was sufficiently severe or pervasive to constitute a hostile work environment. *See, e.g., Mitchell v. Pope*, 189 Fed. Appx. 911, 913-914 (11th Cir. 2006) (unpublished) (evidence that supervisor tried to kiss plaintiff, rubbed against her inappropriately, reached across her chest, lifted her up over his head, made several comments including "you sure do look fine," "you must be working out," "your ass sure does look fine," "you can just walk into the room and I'd get an erection," and tried to convince plaintiff to join him in a hot tub and called her a "frigid bitch" when she refused, over the course of plaintiff's four-year employment, while "reprehensible," was best described as "crass and juvenile," and not objectively severe or pervasive to violate Title VII); *Spraque v. Thorn Am., Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (holding that five sexually-oriented incidents over sixteen months were sporadic, not severe or pervasive).

The undersigned thus finds that Plaintiff has failed to present sufficient evidence to establish a *prima facie* case of a hostile work environment based on sexual harassment. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion

for Summary Judgment [53] be **GRANTED** as to Plaintiff's claim of "Violation of Title VII Sexual Harassment" in Count One of the Complaint.

    2.   *Retaliation*

In Count Two of the Complaint, Plaintiff asserts a claim for "Title VII Prohibited Retaliation." Comp. at ¶¶ 66-70. She alleges that she "engaged in activity protected under Title VII by opposing the hostile work environment created by Seligman's sexual harassment." *Id.* at ¶ 67. She claims that, after she opposed the "sexual harassment," she "suffered multiple adverse employment actions, including but not limited to unpaid suspension and ultimately, termination." *Id.* at ¶ 68.

Title VII acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee or applicant] has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Proof of retaliation is governed by the framework of shifting evidentiary burdens established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of*

*Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). In order to prevail, a plaintiff must first establish a *prima facie* case of retaliation. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985). Once a *prima facie* case has been established, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver*, 922 F.2d at 1525-1526. If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601.

a. *Prima Facie* Case

To establish a *prima facie* case of illegal retaliation under 42 U.S.C. § 2000e-3(a), Plaintiff must show that: (1) she engaged in a protected activity or expression; (2) she received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Weaver v. Casa Gallardo,*

*Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

(1)   Protected Activity

A plaintiff claiming unlawful retaliation under Title VII can show that she engaged in a protected act under Title VII through evidence of either "participation" or "opposition." An act of participation ordinarily requires the existence of a Title VII proceeding or investigation. *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999). Plaintiff does not argue that she engaged in a protected act under Title VII by her "participation" in an EEOC proceeding. She does not allege that she filed an EEOC Charge against MCP at any time before her employment was terminated on or around December 7, 2012. Instead, Plaintiff argues that she engaged in a protected activity under the "opposition" clause of Title VII. Pl. Br. [69] at 27.

Making informal complaints to superiors about suspected illegal discrimination may qualify as protected expression under the opposition clause of Title VII. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997); *see also Rollins v. Fla. Dep't. Of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) ("[W]e recognize that the protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like [the plaintiff], who informally voice complaints to

52

their superiors."). Nevertheless, not every informal complaint made by an employee automatically qualifies as a protected expression that shields the employee from subsequent retaliation.

In order for an employee engaging in opposition activity to be protected under the anti-retaliation provision of Title VII, she must be opposing conduct that is made an "unlawful employment practice" by Title VII. Title VII defines an "unlawful employment practice" as, *inter alia*, discrimination against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In other words, it is not enough for a plaintiff to show that she opposed garden-variety unfairness or harsh treatment in the workplace; she is only protected from retaliation if the practice she opposed is specifically prohibited by Title VII.

To recover under a theory of retaliation, a plaintiff need not *prove* the underlying claim of discrimination that led to the complaint, so long as she had a "good faith, reasonable belief" that the conduct or practice she was opposing constituted unlawful discrimination. *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). The reasonableness of the plaintiff's belief is measured against the law as it

existed at the time of the protected activity; thus, the plaintiff is charged with knowledge of the parameters of what Title VII does and does not prohibit. *Clover*, 176 F.3d at 1351; *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997).

Defendant MCP does not argue that the Plaintiff's retaliation claim fails because she did not have a "good faith" or "reasonable belief" that she was opposing an unlawful employment practice at the time she allegedly made the complaints about Seligman. Instead, Defendant argues that Plaintiff did not engage in a protected activity because she "did not make any allegations of sexual harassment." Def. Br. at 24. Defendant argues that Plaintiff did not complain about "sexual harassment" to anyone at MCP, but instead "complained about a disabled employee being a violent threat because of rumors about past incidents in the workplace." *Id.*

The evidence in the record regarding Plaintiff's alleged complaints about Seligman to Maloney and other managers at MCP is set forth in detail above. In sum, Plaintiff alleges that she complained to Maloney and that she also complained to Wright and Davie about Seligman. According to Plaintiff, she first complained to Maloney about Seligman's inappropriate behavior soon after Seligman was transferred to the KOR. Pl. SMF at ¶ 34. Plaintiff claims that she told Maloney that she felt uncomfortable working with Seligman because he invaded her personal space, stared

at her, bumped against her, and "rubbed up against her with an erection." Pl. SMF at ¶¶ 35, 39.

According to Plaintiff, she went to Maloney with complaints about Seligman "several times" during the period of time she worked with Seligman. Pl. SMF at ¶ 36. Plaintiff complained to Maloney because she continued to feel threatened, unsafe, and humiliated due to Seligman's behavior, and she could not work in a situation where she was so "frequently sexually harassed." Pl. SMF at ¶ 38. After Plaintiff showed Maloney the photograph she had taken of Seligman, she claims that she complained that Seligman "exhibited an erection during the work hours on a daily basis." Pl. SMF at ¶ 48. Plaintiff claims that she again told Maloney that did not feel comfortable working with Seligman and she felt "sexually harassed by him." Pl. SMF at ¶ 48.

The evidence supporting Plaintiff's claims that she told Maloney she felt "sexually harassed" by Seligman is disputed by the parties. Although Plaintiff is now claiming that she told Maloney that she felt "sexually harassed" by Seligman, she relies mainly on her Declaration submitted in response to the Defendant's Motion for Summary Judgment to support this allegation. During her deposition, Plaintiff did not testify that she ever complained to Maloney about being "sexually harassed." Pl. Dep. at 115-16. Plaintiff testified during her deposition that she made her first complaint

about Seligman to Maloney "a week or so" after Seligman arrived on the KOR dock.[14]

Pl. Dep. at 112. She claims that she told Maloney: "he is extremely too close to me,

that the rubbing up against me, I find it offensive and I don't appreciate it." *Id.*

Plaintiff also testified that, when she showed Maloney the photograph of

Seligman on or around Monday, December 3, 2012, she told Maloney, "Now I have

proof of what I'm saying. This is inappropriate. I'm very uncomfortable. It's affecting

me doing my job. I don't even want to bend down and lift stuff up." Pl. Dep. at 115.

She also testified that she told Maloney: "This is what I have to work with on a daily

basis and I think it's very inappropriate for me to have to work under these

conditions." *Id.* at 116. Plaintiff was asked during her deposition specifically what she

said to Maloney, but she never testified that she ever said to Maloney that she felt

"sexually harassed" by Seligman. *See id.* at 112-16.

Plaintiff also claims that she complained about Seligman in the December 5

Email, which is set forth in its entirety above. In the December 5 Email, Plaintiff did

---

[14] It is undisputed that Plaintiff showed the photograph to Maloney on or around Monday, December 3, 2012. Def. SMF at ¶ 51; Pl. SMF at ¶ 48. Thus, to the extent that Plaintiff is claiming she made her first complaint to Maloney after Seligman started working on the KOR, but before she showed Maloney the photograph, she must have made her first complaint to Maloney between November 28-30. If Plaintiff actually made her first complaint about Seligman "a week or so" before Seligman began working at the KOR dock, that would mean that her first complaint was made on or around Tuesday, December 4, 2012, the day after she showed Maloney the photograph, and the day before she was suspended.

mention that Seligman "constantly" had an erection, which made her feel "uncomfortable." Pl. Dep, Ex. 12 [57-12]. But the main complaint that Plaintiff expressed in the December 5 Email was that she was in "fear for [her] safety" based on the alleged threats that she had heard that Seligman had made to other people regarding a "robbery" and a "murder." *Id.* Plaintiff stated in the email that "I have quite a few experiences with people making threats of murder has indeed went through with it. I can show proof of all my personal experiences. I really need to speak with someone ASAP concerning this." *Id.* She did not mention anything about "sexual harassment" nor make any complaint that she had been "harassed" by Seligman because of her sex. Indeed, in the December 5 Email, she doesn't claim that Seligman said or did anything *to her* at all, only that she had heard about alleged threats of "robbery" and "murder" he had made to other employees.

Finally, Plaintiff claims that she complained to Wright and Davie about Seligman during the December 5 meeting with them. According to Plaintiff, during the December 5, 2012 meeting, she raised her "complaints regarding Seligman's constant erection, prior complaints of sexual harassment and threatening conduct in the workplace against Seligman, and how uncomfortable she felt working with Seligman." Pl. SMF at ¶ 66. As noted above, Defendant objects to this contention on the ground that Plaintiff's deposition testimony completely contradicts this claim. Def.

Resp. SMF at ¶ 66. Plaintiff testified during her deposition that she did not say anything at all about Seligman to Wright and Davie during that meeting: "When they called me in, I didn't get really time to say anything. They asked for the photo. I gave them the photo. It wasn't really much said on my behalf. They didn't want to know anything about my situation. . . . I tried to get a word in and I really couldn't get any words in. They told me what this situation was going to be and I was suspended." Pl. Dep. at 256.

Plaintiff also cites to Davie's deposition testimony to support her claim that she complained about Seligman's "sexual harassment," but Davie's testimony does not support her contention. Davie testified that Plaintiff said to him, "I think it's not right for Danny to have an erection in the workplace," but when he asked her if Seligman ever made any "inappropriate comments" to her or ever touched her, she said "no." Davie Dep. at 188-89. Thus, neither Plaintiff nor Davie testified that Plaintiff ever made any complaint about Seligman's alleged "sexual harassment" during the December 5 meeting. Indeed, according to Davie, Plaintiff denied that Seligman ever made any inappropriate comment to her or touched her.[15]

_____

[15] In her response brief, Plaintiff contends that Defendant's argument that she never complained about "sexual harassment" ignores Davie's testimony. *See* Pl. Br. at 26-27. Davie testified that Plaintiff never made any complaint of sexual harassment. Davie Dep. at 276. Davie testified that, if Plaintiff had ever complained to him that Seligman touched her while he had an erection, he would have considered that to be a complaint of sexual harassment. *Id.* at 198-99. But he denied that Plaintiff ever

The Eleventh Circuit has held that, in order to establish that a complaint was a protected activity for the purpose of a retaliation claim, the employee must "'at the very least, communicate her belief that discrimination is occurring to the employer,' and cannot rely on the employer to 'infer that discrimination has occurred.'" *Demers v. Adams Homes of Northwest Fla., Inc.*, 321 Fed. Appx. 847, 852, 2009 WL 724033 at *4 (11th Cir. March 20, 2009) (*per curiam*) (unpublished) (quoting *Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1390 (S.D. Fla. 1998)); *see also Foster v. Humane Society of Rochester and Monroe County, Inc.*, 724 F.Supp.2d 382, 395 (W.D.N .Y. 2010) (granting a motion to dismiss on a retaliation claim on the ground that the plaintiff alleged only that she complained about problems she was having at work, not that she complained that she was being discriminated against on account of her sex); *Brown v. City of Opelika*, 211 Fed. Appx. 862, 864 (11th Cir. 2006) (*per curiam*) (unpublished) ("the record contained no evidence that Brown engaged in a protected activity by making a complaint about racial discrimination or harassment"); *Jeronimus v. Polk County Opportunity Council*, 145 Fed. Appx. 319, 326 (11th Cir. 2005) (*per curiam*) (unpublished) (while the plaintiff complained about being "singled out," being subjected to "a campaign of harassment," and working in a "hostile environment," "he never suggested that this treatment was in any way related to his

---

complained to him that Seligman had touched her, bumped into her, or even stared at her. *Id.*

race or sex"); *Fields v. Locke Lord Bissell & Liddell LLP*, 2009 WL 2341981 at *12, 16 (N.D. Ga. July 28, 2009) (Thrash, J.) (unpublished) (plaintiff failed to engage in protected activity because she failed to show that she ever communicated her belief to the employer that she was being treated differently because of her race or sex); *Fitzhugh v. Topetzes*, 2006 WL 2557921, at *11-12 (N.D. Ga. Sept. 1, 2006) (Story, J.) (unpublished) (granting summary judgment on a claim of race-based retaliation under 42 U.S.C. § 1981, on the ground that the plaintiff complained about personal animus, being "singled out" for unfair treatment, and "discrimination" against her as an individual, rather than complaints targeting race-based animus or disparate treatment).

Although Plaintiff is now claiming that she complained about alleged "sexual harassment" by Seligman, her deposition testimony contradicts that claim. As discussed above with regard to the Defendant's Motion to Exclude, a party may not rely on an affidavit directly contradicting her own deposition testimony in order to create an issue of fact to defeat a motion for summary judgment. Plaintiff was asked during her deposition what she said to Maloney about Seligman, and was asked what she said to Wright and Davie during the December 5 meeting, and at that time, she never claimed that she complained about "sexual harassment." Her statements in her Declaration to the contrary cannot be considered sufficient to create a genuine issue

of fact on this issue. For that reason, the Court finds that Plaintiff has failed to establish a *prima facie* case of retaliation under Title VII because she had failed to present sufficient evidence that she engaged in a protected activity by opposing an "unlawful employment practice."

Moreover, even assuming that Plaintiff's complaint about Seligman's "constant" erection in the workplace could be viewed as a complaint that he was "sexually harassing" her, despite Plaintiff's lack of evidence that the alleged erection had anything at all to do with her, the Court finds that Defendant would still be entitled to summary judgment on Plaintiff's retaliation claim. Even if Plaintiff has presented a *prima facie* case, the Court finds that MCP has presented sufficient evidence that it had a legitimate reason for terminating her employment, and Plaintiff has not presented sufficient evidence that the MCP's proffered reason is a mere pretext for unlawful retaliation.

(2)   Adverse Employment Action

The second element of a *prima facie* case of retaliation under Title VII requires the Plaintiff to show that she suffered an adverse employment action after engaging in the protected activity. Defendant does not dispute that Plaintiff suffered an adverse employment action when she was suspended on or about December 5, 2012, and when her employment was terminated on or about December 7, 2012.

(3)    Causal Link

For the third and final element of a *prima facie* case of retaliation, Plaintiff must establish that there is a causal link between the protected activity and the adverse employment action. Plaintiff is not required to establish "the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985); *see also Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991). Rather, Plaintiff can satisfy the third element merely by presenting evidence that the protected activity and the subsequent adverse employment action are not totally unrelated. *Simmons*, 757 F.2d at 1189; *see also Hairston*, 9 F.3d at 920; *Weaver*, 922 F.2d at 1525.

In order to establish a causal connection between protected conduct and an adverse employment action, however, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("A plaintiff satisfies this element if she provides sufficient evidence of

knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action."); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("To establish a causal connection, a plaintiff must show that the decision-maker[s] [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated.") (emphasis added). As the Eleventh Circuit has stated, this requirement "rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). The defendant's awareness of the protected statement, however, may be established by circumstantial evidence. *Goldsmith*, 996 F.2d at 1163.

In her brief, Plaintiff argues that she has presented "direct evidence" of a causal link between her protected activity and the adverse employment action. Pl. Br. at 23-24. According to Plaintiff, "Defendant admits that Plaintiff was suspended and two days later terminated because she took a picture of Seligman's erection," and "Plaintiff took the picture of Seligman's erection to provide evidence in support of her claim of sexual harassment." *Id.* Thus, she argues, she has presented direct evidence that there was a causal link, and "Defendant's motion must be denied." *Id.*

Plaintiff cites to no authority in support of this argument, and the Court rejects it, finding that the evidence Plaintiff cites does not rise to the level of direct evidence

that Defendant retaliated against her for opposing an unlawful employment practice. While it is true that one of reasons the Defendant has proffered for its decision to terminate the Plaintiff's employment is her showing the photograph of her co-worker's genital area to other co-workers and managers at MCP after she was told not to show the photograph to anyone, Plaintiff does not explain how this constitutes direct evidence that Defendant intended to retaliate against the Plaintiff for opposing sexual harassment. Indeed, according to Defendant, the decisionmakers were not even aware that the Plaintiff had claimed that she was the victim of "sexual harassment."

In any event, Defendant's position is that Plaintiff was suspended and terminated not for complaining about Seligman's conduct, but for repeatedly showing a photograph of his crotch area around the workplace. It was not the complaint, but the inappropriate way in which Plaintiff went about making the complaint, otherwise showing an inappropriate photograph around the office. This is not direct evidence of causation. The Court nevertheless reviews the Plaintiff's circumstantial evidence of a causal link.

Absent other evidence of a causal link, a plaintiff may establish an inference of causation merely by showing that she suffered the adverse action shortly after she engaged in the protected activity. *Higdon*, 393 F.3d at 1220; *Bass v. Board of County Comm., Orange County, Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001); *Brungart*, 231

F.3d at 798. For a plaintiff to establish such a link by mere temporal relationship, however, the challenged decision must follow almost immediately after the protected expression to support the logical inference that the two events were related. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close.") (internal quotes omitted).

The Eleventh Circuit has held that a gap of three months or more between the protected activity and the challenged personnel action is too long to support the inference that the two events were connected. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (three-month period does not rise to the level of "very close" to support an inference of a causal link); *Higdon*, 393 F.3d at 1221 (three-month period does not allow a reasonable inference of causation); *see also Conner v. Schnuck Markets, Inc.*, 123 F.3d 1390, 1395 (10th Cir. 1997) (lapse of four months between protected activity and termination did not support inference of casual connection); *Feltmann v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997) (passage of six months between plaintiff's complaint and firing insufficient, without more, to establish causation); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992)

(four-month gap between filing discrimination complaint and receipt of disciplinary letter did not give rise to inference of causal relation).

Plaintiff claims that she engaged in a protected activity when she complained to Maloney about Seligman's "constant" erection, and that it was inappropriate and made her uncomfortable. Plaintiff testified during her deposition that she first complained to Maloney about "a week or so" after Seligman started working at the KOR. Pl. Dep. at 112. It is undisputed that Seligman began working at the KOR on or around November 27, 2012; thus, according to her testimony, Plaintiff first complained about him to Maloney on or around December 3, 2012.[16] Plaintiff also claims that her December 5 Email was a protected activity, and that her alleged complaints to Wright and Davie during the December 5 meeting were also a protected activity.

Assuming that Plaintiff were able to show that her alleged complaints about Seligman could be viewed as a protected activity, the Court finds that Plaintiff has presented sufficient evidence that the adverse employment action occurred very close in time after her protected activity, only a few days at the most. Plaintiff claims that

---

[16] Because it is undisputed that Plaintiff showed the photograph to Maloney on or around Monday, December 3, 2012, and because she claims that she first complained about Seligman before she ever took the photograph to show to Maloney, the evidence indicates that Plaintiff likely made her first complaint to Maloney around November 28-30, 2012. *See* note 14, *supra*.

she complained about Seligman to Maloney on or around December 3, 2012, and then complained in the December 5 Email, and then complained again to Wright and Davie in their meeting with her on December 5, 2012. Undoubtedly the very short temporal proximity between her alleged complaints and her suspension on December 5, 2012, and her termination on December 7, 2012, would be sufficient to constitute circumstantial evidence of a causal link.

Defendant argues, however, that Plaintiff cannot establish any causal link between her alleged complaints and the termination of her employment, because "intervening factors" destroy any evidence of causality based on the temporal proximity. Def. Br. at 25. In support of that argument, Defendant relies on *Dowlatpanah v. Wellstar Douglas Hosp.*, No. 1:05-CV-2752-WSD-RGV, 2006 WL 4093123, at *14 (N.D. Ga. Dec. 5, 2006) (Vineyard, M.J.) (holding that "temporal proximity, standing alone, may not be sufficient to establish the causal link between them, particularly when the defendant establishes intervening factors"), *report and recommendation adopted sub nom. Dowlatpanah v. Wellstar Health Sys., Inc.*, 2007 WL 639875 (N.D. Ga. Feb. 26, 2007).

In *Dowlatpanah*, the plaintiff was counseled for performance issues before he made any protected activity, and then was counseled again for performance issues after he engaged in the protected activity. *Dowlatpanah*, 2006 WL 4093123, at *14-

15. Magistrate Judge Vineyard found that, because the "plaintiff's termination followed a period of progressive discipline that preceded his protected activity," the temporal proximity alone could not constitute evidence of a causal link between the protected activity and the termination. *Id.* at \*15 (*citing Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[W]hen an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.") and *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272-73 (2001) (when the evidence revealed that the employer contemplated transferring an employee before the employer learned that the employee filed a Title VII suit, the employer's decision to proceed "along the lines previously contemplated, though not yet definitively determined," did not establish evidence of causality)); *see also Spence v. Panasonic Copier Co.*, 46 F.Supp.2d 1340, 1348 (N.D.Ga. 1999) (Brill, M.J.) (the mere chronological factor alone that the adverse employment action followed the protected activity is insufficient to demonstrate causation).

Defendant argues that, "[a]lthough there is temporal proximity from the time of any alleged protected activity and the suspension and termination, there are intervening factors that justify Defendant's decision to terminate her." Def. Br. at 25.

Defendant then argues that it had legitimate reasons to suspend the Plaintiff and terminate her employment. Defendant has not shown, however, that the "intervening factors" occurred *prior* to the Plaintiff's alleged protected activity, as was the case in *Dowlatpanah*. Defendant argues that the "intervening factors" were the result of Plaintiff's taking the photograph of Seligman and "continuously showing the picture around the workplace after being told not to show the picture." Def. Br. at 25. But Plaintiff claims that she first complained to Maloney soon after Seligman started working on the KOR, before she took the photograph. Pl. SMF at ¶¶ 34-39. Plaintiff claims that she only took the photograph to "support" her claim of "sexual harassment" and to provide proof to Maloney that Seligman had an erection in the workplace. Pl. SMF at ¶ 45.

Thus, the Court finds that, based on the temporal proximity, Plaintiff has presented evidence of a causal link between her alleged complaints and her suspension and termination. Assuming that Plaintiff were able to show that her alleged complaints about Seligman could be viewed as a protected activity, the Court finds that Plaintiff would be able to present sufficient evidence to establish a *prima facie* case of retaliation. Nevertheless, the Court finds that Defendant is entitled to summary judgment because it has presented evidence that it had a legitimate reason to suspend

Plaintiff and terminate her employment, and Plaintiff has failed to present evidence that Defendant's reason was a mere pretext for unlawful retaliation.

> b.     Defendant's Legitimate Reason

The Court finds that Defendant has presented sufficient evidence that it had legitimate reasons for the decision to suspend Plaintiff and terminate her employment, and those reasons were not based on any intent to retaliate against her for complaining about "sexual harassment." Defendant argues that it "had several legitimate and non pretextual reasons to terminate Plaintiff." Def. Br. at 26.

The facts surrounding the Plaintiff's suspension and termination are set forth in detail above and will not be repeated in detail. In sum, the Defendant has presented evidence that Plaintiff was suspended pending an investigation after her meeting with Davie and Wright on December 5, 2012. When Plaintiff met with them, they asked Plaintiff if she had shown her photograph of Seligman to employees other than management, she said yes. Def. SMF at ¶ 76. Plaintiff also stated to Davie and Wright that she believed that Seligman was a threat to the workplace. Def. SMF at ¶ 77. According to Defendant, Plaintiff stated: "You don't know what people like that will do. My cousin works with people like him and he told me they can become violent at any time and you can't tell if and when it will happen." Def. SMF at ¶ 82.

Defendant contends that Davie told Plaintiff that it was inappropriate to take photos of another employee's crotch area and that it was also inappropriate to show photos of an employee's crotch area to other employees. Def. SMF at ¶ 86. Davie testified that he told Plaintiff: "Well, Myra, you understand that you're in a work environment, you cannot use your cellphone to take pictures of individuals, and especially individual's, of their body parts, which is reflected in this picture you showed me." Davie Dep. at 196. According to Davie, Plaintiff responded, "Well, I'm going to do whatever I have to do to make sure that people know Danny has an erection." *Id.* Defendant contends that Plaintiff was advised that she was being sent home pending an investigation of the incidents reported, and she was told that she should refrain from showing the picture or speaking to "anyone else" about the investigation. Def. SMF at ¶¶ 87-88.

Defendant further contends that, the very next day, December 6, 2012, an HR Representative from TCCC contacted Defendant to advise Defendant that Plaintiff had contacted a member of TCCC's Corporate Security and made numerous allegations that Defendant and TCCC had placed employees of both companies in danger by not following established security policies and procedures regarding threats in the workplace. Def. SMF at ¶ 89. The representatives told Davie that they were aware of the previous incidents Plaintiff referenced involving Seligman and felt comfortable

that the incidents had been investigated and resolved appropriately. Def. SMF at ¶ 90. According to Defendant, TCCC indicated to Davie they had no concerns with Seligman and did not consider him to be a threat to the workplace. Def. SMF at ¶ 91. The TCCC HR representative expressed TCCC's concern, however, that Defendant had an employee taking and showing pictures of an employee's crotch parts in the TCCC workplace, spreading rumors and contacting TCCC management regarding matters appropriate only for MCP management. Def. SMF at ¶ 92. After concluding that Plaintiff did take the photograph of Seligman, and show it to others, and that she did not follow directives not to discuss confidential employment issues with others, MCP terminated Plaintiff's employment on December 7, 2012. Def. SMF at ¶ 93.

In her response brief, Plaintiff argues that "Defendant has failed to articulate a legitimate non-discriminatory reason for its suspension and termination of the Plaintiff in its brief." Pl. Br. [69] at 30. It is not clear why Plaintiff argues that the Defendant has failed to articulate a legitimate reason.[17] Apparently Plaintiff is arguing that, because she disputes some of the Defendant's evidence, Defendant's evidence of its legitimate reasons should be disregarded by the Court. But, as Plaintiff acknowledges

---

[17] Plaintiff also contends that "Defendant has merely argued that Plaintiff cannot satisfy her prima facie case." Pl. Br. at 25. Contrary to Plaintiff's argument, Defendant in its brief states its reasons for suspending Plaintiff and terminating her employment. Def. Br. at 25-26 (arguing both that her "suspension was justifiable" and her "termination was warranted" and presenting its reasons for both actions).

in her brief, Defendant's burden of showing it had a legitimate reason is a burden of production, not persuasion, and that burden is generally "exceedingly light." Pl. Br. at 25; *see Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988). Plaintiff's arguments regarding the truthfulness of the Defendant's reasons are relevant on the issue of pretext, not whether Defendant has met its burden of production to articulate a legitimate reason for the adverse employment actions.

Because Defendant has presented evidence that it had legitimate reasons for Plaintiff's suspension and termination that were not related to any intent to retaliate against her for complaining about "sexual harassment," in order for Plaintiff to defeat Defendant's Motion for Summary Judgment, she must present sufficient evidence that Defendant's proffered reasons were a mere pretext for unlawful retaliation.

c.      Pretext

A plaintiff may carry her burden of showing that her employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. A plaintiff can either directly persuade the court that a discriminatory or retaliatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Weaver v. Casa Gallardo,*

*Inc.*, 922 F.2d 1515, 1522 (11th Cir. 1991). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804.

Because a plaintiff bears the burden of establishing that a defendant's reasons are a pretext for discrimination or retaliation, a plaintiff "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young*, 840 F.2d at 830.

In this case, Plaintiff argues that she has presented evidence of pretext because "Defendant has admitted that Plaintiff's protected activity was the reason for her suspension without pay and termination." Pl. Br. at 31. As discussed above, the Court rejects the Plaintiff's argument that she has presented direct evidence of retaliation. She has not cited to any evidence in the record that anyone at MCP "admitted" that

the Plaintiff was suspended or fired because she complained about sexual harassment. Indeed, Defendant argues that the relevant decisionmakers were not even aware that Plaintiff was complaining about "sexual harassment" when they made the decision to suspend her and terminate her.

Plaintiff argues further that "[b]oth Plaintiff taking the picture of her hostile work environment and her showing the picture to other co-workers to seek their support in her compliant [sic] of sexual harassment are clearly activities protected by title VII's anti-retaliation provisions." Pl. Br. at 32. Plaintiff cites no authority supporting her argument that taking a photograph of a co-worker's genital region without his knowledge or consent, and then showing it to various co-workers and managers in order to discuss his alleged erection, could be considered a protected activity under Title VII. The Court finds that, certainly under the circumstances of this case, it was not a protected activity. In an effort to bolster her argument, Plaintiff cites to the EEOC Compliance Manual, which states that individuals "may make broad or ambiguous complaints of unfair treatment." Pl. Br. at 32. Significantly, Plaintiff does not cite to a single case holding that taking a surreptitious photograph of a mentally disabled co-worker's genital region to show to other co-workers could be construed as making a "broad or ambiguous complaint of unfair treatment."

Plaintiff also argues that "questions of fact" exist regarding whether she actually violated any work rule or directive, as the Defendant contends. *Id.* at 32-33. Plaintiff claims that she did not violate a work rule by taking the photograph of Seligman, and that she had previously been told by Leo Lieberman that employees should take pictures "of things they noticed and felt were inappropriate." *Id.* at 34. Plaintiff denies that Maloney told her before December 5, 2012, that she should not show the photograph to anyone else. She contends that she was first instructed not to show the photograph to anyone else on December 5, 2012, and she claims she did not show it to anyone after that date. Plaintiff also denies that she ever told Maloney that she could do what she wanted with her cell phone. In addition, she denies that she ever spoke with anyone at TCCC security before her employment was terminated on December 7, 2012. In sum, Plaintiff argues that the Defendant's reasons for suspending her and terminating her employment are pretextual because she contends that she did not do the things that she was accused of doing.

Defendant has presented evidence, however, that Davie and Wright reasonably relied on the information that they were given by Maloney, and also reasonably relied on the information given them by the HR Representative from TCCC. While Plaintiff argues that Davie has no "documentation" to support his allegations regarding the phone call from TCCC, she has cited to no evidence in the record suggesting that

Davie is lying or otherwise providing any basis for disputing his testimony. While Plaintiff also argues that Wright and Davie are not being truthful about what happened at the December 5 meeting, she adduces absolutely no evidence that either Wright or Davie harbored any retaliatory intent against her. Moreover, Plaintiff has not presented evidence that casts doubt on whether Wright and Davie had a reasonable belief that Plaintiff had shown the photograph to other people after Maloney claims that he told her not to do so.

It is not the role of a jury to sit through mini-trials on whether Plaintiff actually showed the photograph to people after Maloney told her not to, or whether and when she contacted TCCC security about her fears about Seligman. Indeed, Wright and Davie could have been wrong when they concluded that Plaintiff had failed to follow Maloney's directive not to show the photograph to anyone, but that in itself is not evidence of pretext. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) ("a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, so long as the reason is one that might motivate a reasonable employer") (internal quotes omitted); *Shealy v. City of Albany*, 89 F.3d 804, 806 n.6 (11th Cir. 1996) (court "does not sit as a sort of 'super personnel officer'. . . correcting what the judge perceives to be poor personnel decisions"); *see also Rojas v. State of Florida*, 285 F.3d 1339, 1344

(11th Cir. 2002) (Title VII does not permit courts to sit in judgment of "whether a business decision is wise or nice or accurate"); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) ("[f]ederal courts do not sit to second-guess the business judgment of employers"); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (the court does "not sit as a super-personnel department that reexamines an entity's business decisions . . . no matter how mistaken").

Whether the Defendant's decision to terminate the Plaintiff's employment was fair or wise is not an issue for the Court or the jury. Harsh or unfair treatment by itself is not a violation of Title VII, and the Court cannot sit in judgment of an employer's decision, absent evidence that a discriminatory or retaliatory motive was the underlying basis. As the Eleventh Circuit has explained:

> Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. Title VII addresses discrimination. . . . Title VII is not a shield against harsh treatment at the workplace. Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, *a reason based on erroneous facts,* or for no reason at all, as long as its action is not for a discriminatory reason. While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve.

*Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1187 (11th Cir. 1984) (internal quotes and citations omitted, emphasis added).

In the end, Plaintiff's argument is nothing more than a dispute with the wisdom or fairness of Defendant's decision to suspend her and terminate her employment and the way it went about doing it. As cited above, the Eleventh Circuit has repeatedly rejected this as evidence of pretext. Plaintiff has not presented any evidence that either Wright or Davie harbored any intent to retaliate against her for making complaints about Seligman's alleged "sexual harassment" of her. In sum, upon a review of the evidence in the record, the Court concludes that Plaintiff has not presented sufficient evidence, either direct or circumstantial, that Defendant's decision to suspend her and terminate her employment was the result of any intent to retaliate against her for making complaints about Seligman.

Thus, even assuming that Plaintiff had presented a *prima facie* case of retaliation, Defendant has presented evidence that it had legitimate reasons to suspend Plaintiff and terminate her employment, and Plaintiff has not presented evidence that the Defendant's reasons were merely pretextual to disguise unlawful retaliation. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [53] be **GRANTED** as to Plaintiff's claim of "Title VII Prohibited Retaliation" in Count Two of the Complaint.

### III.    CONCLUSION AND RECOMMENDATION

For the above reasons, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [53] be **GRANTED**, and that judgment be entered in favor of Defendant on all of Plaintiff's claims. Defendant's Motion to Exclude [74] is **GRANTED IN PART, DENIED IN PART**.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO ORDERED AND RECOMMENDED** this 3rd day of August, 2015.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE